

FILED
CHARLOTTE, NC

FEB 24 2026

US DISTRICT COURT
WESTERN DISTRICT OF NC

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

| | |
|---|---|
| **Laurita Ploughman,** <br> Plaintiff, <br><br> v. <br><br> **Bell Integration, Inc. and TriNet HR III, Inc.,** <br> Defendants. | Civil Action No. 3:26-CV-144-MOC <br><br> **COMPLAINT** <br><br> **(Jury Trial Demanded)** |

Plaintiff Laurita Ploughman ("Plaintiff"), appearing pro se, alleges as follows against Bell Integration, Inc. and TriNet HR III, Inc. ("Defendants"):

## I. PARTIES AND JURISDICTION

1. Plaintiff Laurita Ploughman is a resident of Indian Trail, Union County, North Carolina, residing at 5416 WB Wilkerson Road, Indian Trail, NC 28079.

2. Defendant Bell Integration, Inc. is a Delaware corporation transacting business in North Carolina, with more than 15 employees. Its registered agent is Platinum Filings LLC, 555 E. Loockerman St., Ste 320, Dover, DE 19901.

3. Defendant TriNet HR III, Inc. is a California corporation with principal business at 1 Park Place, Suite 600, Dublin, CA 94568, serving as PEO and employer of record for payroll, benefits administration, and other employment-related services.

4. At all relevant times, Defendants acted as Plaintiff's "joint employers" under the FMLA (29 C.F.R. § 825.106) and the ADA (42 U.S.C. § 12101 et seq.).

5. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, 42 U.S.C. § 12117(a), 29 U.S.C. § 1132, and 29 U.S.C. § 2617. Venue is proper pursuant to 28 U.S.C. § 1391(b).

6. Plaintiff filed EEOC Charge No. 430-2026-00239 on December 1, 2025, amended the charge on January 26, 2026, and received a Right-to-Sue letter on January 29, 2026. This Complaint is timely.

## II. FACTUAL BACKGROUND

### A. Joint Employer Relationship

7. Bell Integration managed all substantive employment decisions for Plaintiff; TriNet managed payroll, benefits, COBRA, leave, and maintained personnel files, always acting under Bell's instructions.

### B. Disability, History, and Accommodations Sought

8. Plaintiff has diagnosed PTSD, major depressive disorder, and severe anxiety disorder, limiting major life functions, for which she notified Defendants and sought accommodations throughout her employment.

9. In January 2025, Plaintiff provided documentation supporting a qualifying disability and recommended accommodations, which Defendants did not consistently honor.

### C. HR Mishandling, Confidentiality Breaches, Escalation

10. In 2025, Plaintiff was the subject of repeated HR investigations and escalations, often for minor workplace communications, which could and should have been handled informally. Plaintiff was subjected to meetings labeled "investigation" which were reclassified as "grievance" when challenged.

11. In May 2025, Plaintiff was called into a one-on-one meeting by Team Lead Sam Vincent regarding a routine workplace chat. The meeting was conducted in a manner that caused Plaintiff to hyperventilate and leave. Three separate licensed healthcare providers—Dr. Copsis (primary care physician), Dr. Taub (treating physician), and Dr. Georgiou (psychotherapist)—each independently submitted documentation supporting three days of medically necessary absence. Despite the two-day documentation threshold being more than satisfied by three independent providers, Plaintiff was told those days would be unpaid. HR Generalist Gina Oxenhandler was required to intervene, confirming in writing that Plaintiff's unlimited Flex PTO plan meant the days must be paid and that no additional accommodation form was required since medical documentation had already been provided (see Exhibit 13). This incident demonstrates that Plaintiff's January 2025 accommodation was never properly implemented—had it been, Sam Vincent would have known from the outset that medically supported absences were to be treated as paid leave.

12. Defendant's inconsistent interpretation and application of leave policies ranged from paid absences under Plaintiff's "flex leave" to demands for new medical paperwork and threats of unpaid leave.

**D. Chronology of Accommodation Requests and Denials**

13. In June 2025, Plaintiff requested an ADA accommodation for a team transfer (due to ongoing hostility and prior unresolved grievance), with support from her supervisors.

14. Nicole Murray (Service Desk Manager) denied the request in writing, referencing "the organizational structure has been solidified... we prefer to preserve a direct report/manager relationship so that knowledge of unique situations and other important details are preserved" (see Exhibit 3).

15. In a subsequent HR follow-up meeting with Bradley D'Silva, when Plaintiff raised that the phrase "unique situations" referenced her disability and accommodation history, neither Nicole Murray nor Bradley D'Silva disputed this characterization on the record. Their silence on this point, combined with the removal of all such language from the written summary, is itself telling.

16. When Bradley D'Silva issued a written meeting summary on June 27, 2025, all reference to Plaintiff's disability or "unique situations" was omitted, replaced with "operational needs" (see Exhibit 4).

17. Plaintiff memorialized this course of events in a November 28, 2025, email to Dominique Phillips (Regional People Partner), stating her accommodation request was denied due to disability. This email was not denied or rebutted by anyone at Bell or TriNet. Throughout this period, correspondence was authored by Dominique Phillips, with Harman Kaur (U.S. HR Representative) copied for visibility—a practice Dominique encouraged and at times required Plaintiff to follow as well. However, Dominique would at times contact Plaintiff directly and separately, bypassing Harman entirely, which created inconsistency and pressure that Plaintiff experienced as isolating and coercive.

18. Plaintiff's prior grievance (2024) had been upheld for hostile conduct, resulting in a "fresh start" by reassignment, but Defendants failed to change the pattern.

### E. Mishandling of ADA/FMLA Leave and Benefits

19. At one point, Dominique Phillips characterized Plaintiff's absence in correspondence using the phrase "mental health leave." This framing had not appeared in any prior doctor's note or formal correspondence. Plaintiff promptly corrected this characterization in writing, clarifying that her absence was qualified ADA and FMLA-protected medical leave. Dominique Phillips never responded to or acknowledged Plaintiff's correction. No formal correction to the record was made by Bell or TriNet (see Exhibit 6).

20. On January 4, 2025, Plaintiff's physician provided a letter supporting accommodations for ongoing therapy and emergency medical treatment. In May 2025, three separate licensed providers—Dr. Copsis, Dr. Taub, and Dr. Georgiou—each submitted documentation supporting Plaintiff's medically necessary absence following the Sam Vincent incident. Defendants failed to implement the accommodations and initially required Plaintiff to take those days without pay, requiring HR intervention to correct, as documented in Exhibit 13.

21. Plaintiff went on protected medical leave beginning October 17, 2025. HR Generalist Harman Kaur confirmed in writing on the same date that Plaintiff's Flex PTO plan would cover her pay and explicitly stated, "you will not need to submit any FMLA paperwork" (see Exhibit 9). Defendants thus confirmed that FMLA was not formally invoked and that Plaintiff's leave was covered by the Flex PTO benefit. Short-term disability (STD) through The Hartford was subsequently approved through April 15,

2026, paying Plaintiff 60% of her salary—a substantial employer-sponsored group benefit, not a discretionary or incidental one. On February 2, 2026, Dominique Phillips explicitly dismissed this benefit as merely "a supplemental financial benefit," mischaracterizing its significance and legal relevance while simultaneously moving to eliminate Plaintiff's paid leave and push her toward unpaid status (see Exhibit 8).

22. On January 5, 2026, while Plaintiff was on protected medical leave, Dominique Phillips sent an email announcing that the Company's Flex PTO policy had been eliminated effective January 1, 2026, and that a new 20-day PTO cap would apply—retroactively and without Plaintiff's knowledge or consent (see Exhibit 10). Notably, the new policy had been introduced December 23, 2025—within the window during which Bell would have received notification of Plaintiff's EEOC charge filed December 1, 2025, which was transmitted directly to Dominique Phillips and Harman Kaur. Plaintiff was subsequently pressured to sign the new policy documents by dates including January 7, 2026, while on protected medical leave. This unilateral mid-leave policy change was applied to Plaintiff without any signed agreement or offer letter addendum that Plaintiff accepted. On February 2, 2026, Defendants further announced they would apply Plaintiff's 10 front-loaded sick days and then move her to unpaid leave—despite active Hartford STD approval through April 15, 2026, and despite having promised continued pay. Benefits were then wrongfully terminated on February 1, 2026 as if Plaintiff's hours had been reduced (see Exhibit 5).

23. Plaintiff's January 30, 2026 paycheck—the last paycheck received—reflects that Defendants were actively administering benefits that pay period, with the employer covering $674.90 in benefit costs and Plaintiff contributing $224.30 in pre-tax deductions for her employee portion. Despite this, Defendants terminated Plaintiff's

coverage effective February 1, 2026—one day after this paycheck was issued—and continued to deduct employee benefit premiums. Plaintiff's paycheck portal further reflects that her next scheduled pay date of February 13, 2026 produced no payment, confirming that the wages promised by Dominique Phillips for that period were never paid (see Exhibits 5 and 7).

24. COBRA was initiated for "reduction in hours" (see Exhibit 5) despite Plaintiff being actively employed and on approved medical leave.

## F. Pattern of Escalation and Post-EEOC Retaliation

25. In December 2025, after Plaintiff filed an EEOC charge, Defendants increased demands for medical paperwork, sent repeated DocuSign packets including restrictive NDA and noncompete agreements, and pressured Plaintiff to sign updated PTO policy documents—all during protected leave. Specifically, when Dominique Phillips transmitted the new PTO policy notification, she appended a "Restrictions on Termination of Employment" addendum at the bottom of the communication in a manner that implied Plaintiff had accepted or agreed to its terms—despite Plaintiff having never signed or agreed to the document. When this was identified, Defendants voided the document in January 2026 and subsequently claimed the inclusion was due to a typographical error. This was the first of two DocuSign documents voided by Defendants during Plaintiff's protected leave. Notably, on February 18, 2026—five days before Plaintiff's right-to-sue deadline—Defendants abruptly voided a second DocuSign agreement titled "T2 None Exec Bell Integration – Employee Confidential Info Inventions" with the stated reason "no longer required," without explanation (see Exhibit 12). The pattern of transmitting restrictive employment documents during

protected medical leave in a manner implying consent—then voiding them when challenged—constitutes evidence of bad faith and an attempt to obtain legal advantage over Plaintiff while she was medically unable to fully evaluate such demands.

26. On multiple occasions, Defendants sent mass email requests with invasive or generically flawed ADA accommodation forms, demanded intrusive diagnosis information, and failed to meaningfully engage in good-faith interactive process. As a specific example, the ADA Medical Certification form transmitted to Plaintiff by Defendants contained unfilled placeholder text—including the literal bracket notation "[COMPANY NAME]" and "[Individual/Department]"—indicating the form was never properly prepared for Plaintiff's individual situation and was instead a generic template sent without meaningful review or customization (see Exhibit 11). This demonstrates that Defendants' purported interactive process was a bureaucratic formality rather than the individualized, good-faith engagement required by law. On February 2, 2026, Dominique Phillips further stated that the ADA interactive process required direct personal engagement from Plaintiff—demanding Plaintiff sign a release and communicate directly with the Company despite her provider's active no-contact directive. This position is legally incorrect. Under the ADA and EEOC guidance, the interactive process must be flexible; when an employee's medical provider has restricted direct work-related communication as part of treatment, the employer is obligated to find alternative means of engagement—such as directing inquiries to the provider or a designated representative—rather than demanding the employee personally respond in violation of her medical restrictions. Defendants' insistence on direct engagement despite the medical directive constituted a unilateral breakdown of the interactive process by the employer, not the employee.

Page 8
Case 3:26-cv-00144-MOC-WCM   Document 1   Filed 02/24/26   Page 8 of 17

**27.** After Plaintiff's provider issued work-communication "no contact" directives, Defendants continued to contact Plaintiff, further worsening her health and undermining the therapeutic purpose of leave. On February 5, 2026, Dominique Phillips explicitly acknowledged receipt of the provider's no-contact recommendation but stated that the Company reserved the right to continue sending communications directly to Plaintiff—in direct contradiction of the provider's medical directive and the ADA's requirement to accommodate such restrictions (see Exhibit 8). Plaintiff had already provided Dr. Georgiou's office contact information and communicated that he was prepared to respond to specific written questions regarding Plaintiff's functional limitations and accommodations directed to his office. Defendants' insistence on direct personal contact with Plaintiff, rather than utilizing the provider's offered written channel, reflects a deliberate disregard of both the medical directive and a reasonable alternative accommodation pathway.

**28.** Defendants sent additional correspondence in January through February 2026, including: (a) voided DocuSign agreements while still referencing outstanding conditions, including a non-disclosure and intellectual property assignment agreement voided February 18, 2026 with no substantive explanation (see Exhibit 12); (b) non-compete agreements and new policy notices; and (c) repeated failure to correct health benefits records and payroll mistakes. Taken together, this pattern of sending and then voiding documents during Plaintiff's protected leave demonstrates an ongoing attempt to secure legal advantage over Plaintiff while she was medically unable to fully evaluate or respond to such demands.

**29.** Defendants delayed or outright failed to pay Plaintiff for leave, terminated group health, life, 401(k), and related benefits, and failed to resolve coverage for Plaintiff or her

dependent son (see Exhibits 1–14).

### G. Ongoing Damages and Harm

**30.** These acts resulted in financial and emotional harm, including:

— Loss of pay, benefits, covered therapy, and 401(k)/life insurance;

— Loss of pre-authorized mental health coverage for Plaintiff's son;

— Exacerbation of Plaintiff's disability and medical conditions by disregard of her provider's directives and no-contact orders;

— Forced early exit from the workforce and exposure to restrictive NDA/non-compete pressures at age 59.

**31.** Defendants repeatedly failed to resolve, correct, or even respond to Plaintiff's documented, good-faith requests and clarifications, confirming ongoing retaliation and lack of procedural fairness.

### III. CLAIMS FOR RELIEF

WHEREFORE, Plaintiff respectfully requests all relief the Court deems just and proper, including:

### A. Declaratory Relief

**1.** Judgment declaring Defendants violated the ADA, FMLA, and ERISA.

### B. Injunctive Relief

**2.** Immediate reinstatement of health insurance coverage retroactive to February 1, 2026.

3. An order requiring Defendants to cease retaliation and comply with ADA interactive process.

4. An order requiring Defendants restore Plaintiff's Flex Leave policy or pay its accrued value.

## C. Compensatory Damages

5. Back pay from February 13, 2026 forward, including 20 days PTO promised on February 2, 2026.

6. Lost wages and benefits at 60% STD rate (Hartford-approved) continuing until Plaintiff reaches full Social Security retirement age, as Defendants' discriminatory conduct and non-compete restrictions have effectively forced Plaintiff into early retirement at age 59.

7. Refund of premiums deducted for coverage after wrongful COBRA designation.

8. Out-of-pocket medical expenses incurred due to insurance termination.

9. Emotional distress damages for health deterioration and treatment regression.

10. Loss of 401(k) and life insurance coverage during the wrongful benefits termination period.

11. Compensation for forced early retirement risk and diminished employment prospects due to retaliatory acts.

## D. Consequential Damages

12. Compensation for harm to continuity of Plaintiff's son's inpatient mental health treatment and family crisis.

### E. Front Pay

13. Plaintiff seeks front pay because Defendants failed to provide a safe, non-discriminatory work environment after the 2024 grievance was upheld and continued a pattern of discrimination and retaliation, making reinstatement unsafe or impractical. At age 59, Plaintiff faces significant obstacles to securing comparable employment in her field, in part due to Defendants' issuance of restrictive NDA and non-compete agreements targeting industries and roles aligned with her skills and background, including but not limited to hospitals, technology (Salesforce, IBM, AI, cloud computing), and other competitive sectors in which Bell operates.

### F. Liquidated Damages

14. Double damages under 29 U.S.C. § 2617(a)(1)(A)(iii) for willful FMLA violations. At age 59, Plaintiff now faces significant obstacles to securing competitive employment, in part due to Defendants' issuance of restrictive NDA and Non-Compete agreements targeting industries and roles aligned with Plaintiff's skills and background, including but not limited to hospitals, technology (Salesforce, IBM, AI, cloud computing), and other competitive sectors in which Bell operates.

15. Because Defendants failed to ensure a safe work environment after the 2024 grievance and have continued a pattern of discriminatory and retaliatory conduct, Plaintiff is entitled to front pay to compensate for lost future earnings and employment opportunities, to the extent restoration or reinstatement is not feasible and safe.

### G. Punitive Damages

16. For Defendants' willful, malicious conduct, including fraudulent COBRA designation, false claims of inquiry, demanding compliance with invalid forms, breaking pay promises, pattern of non-response, and terminating benefits despite ongoing disability leave.

### H. Pre-Judgment Interest

17. Interest on all monetary awards from the date of loss.

### I. Attorney's Fees and Costs

18. Reasonable attorney's fees and costs under 42 U.S.C. § 12117(a), 29 U.S.C. § 2617(a)(3), and 29 U.S.C. § 1132(g), if counsel is retained.

### J. Jury Trial

19. Plaintiff demands trial by jury on all issues so triable.

### K. Such Other Relief

20. As the Court deems just and proper.

Respectfully submitted this 24th day of February, 2026.

*[signature]*

Laurita Ploughman, Pro Se
5416 WB Wilkerson Road
Indian Trail, NC 28079

# EXHIBIT LIST

The following exhibits are attached in support of this Complaint:

Exhibit 1: EEOC Right-to-Sue Letter

Exhibit 2: November 2024 Grievance Appeal Decision—Grievance Upheld by Executive Director

Exhibit 3: June 27, 2025 Email/Letter Denying Accommodation ("Special Circumstances" language)

Exhibit 4: Medical Letters from Dr. Gregory Georgiou, Ph.D., LCMHC, Including: (a) January 2, 2026 Letter Documenting Plaintiff's Disability and Need for Continued Leave; (b) January 13, 2026 Letter Documenting Ongoing Disability and Functional Limitations Written in Response to Escalating Employer Communications During Protected Leave; and (c) February 2, 2026 Assessment Documenting Regression in Treatment Progress Caused Directly by Employer Contact, Reiterating No-Contact Directive, and Noting Plaintiff's Significant Difficulty Completing Daily Life Activities in Multiple Domains

Exhibit 5: January 29, 2026 COBRA Termination Letter (first page—stating "reduction in hours of employment")

Exhibit 6: February 11, 2026 Email from Dominique Phillips (HR's acknowledgment of Plaintiff's COBRA challenge and promise to follow up)

Exhibit 7: January 30, 2026 Paycheck Detail Showing Employer Benefit Coverage of $674.90 and Employee Pre-Tax Benefit Deduction of $224.30 on the Last Paycheck Issued—One Day Before Benefits Were Terminated—Together With Paycheck History Showing February 13, 2026 Pay Date With No Payment Issued

Exhibit 8: February 2 and February 5, 2026 Emails from Dominique Phillips: (a) February 2, 2026 email promising Plaintiff 10 front-loaded paid sick days while on leave—sent one day after benefits were already silently terminated February 1, 2026 without notice—while simultaneously characterizing Hartford STD as a "supplemental financial benefit" and demanding direct engagement despite provider's no-contact directive; (b) February 5, 2026 email acknowledging but expressly overriding provider's no-contact directive

Exhibit 9: October 17, 2025 Email from Harman Kaur (HR) Confirming Flex PTO Coverage and Explicitly Stating "You Will Not Need to Submit Any FMLA Paperwork"

Exhibit 10: January 5, 2026 Email from Dominique Phillips Announcing Retroactive Elimination of Flex PTO Policy and Imposition of 20-Day PTO Cap—Sent During Protected Medical Leave Without Plaintiff's Consent

Exhibit 11: ADA Accommodation Request Form and Medical Certification Form Transmitted by Defendants to Plaintiff Containing Unfilled Placeholder Text, Including "[COMPANY NAME]" and "[Individual/Department]," Demonstrating Absence of Good-Faith Individualized Interactive Process

Exhibit 12: (a) January 2026 Voided DocuSign Transmission—"Restrictions on Termination of Employment" Addendum Appended to PTO Policy Notification in Manner Implying Plaintiff's Acceptance, Without Plaintiff's Signature or Agreement, Subsequently Voided by Defendants With Claim of Typographical Error; and (b) February 18, 2026 DocuSign Void Notice—"T2 None Exec Bell Integration – Employee Confidential Info Inventions" Voided With Stated Reason "No Longer Required," Five Days Before Plaintiff's Right-to-Sue Filing Deadline, Without Explanation

Exhibit 13: May 22, 2025 Email from HR Generalist Gina Oxenhandler Confirming Unlimited Flex PTO Coverage, Confirming No Additional Accommodation Form Required as Doctor's Note Already Provided, and Correcting Sam Vincent's Improper Designation of Medically Supported Absence as Unpaid Leave

Exhibit 14: February 1, 2026 Letter from Dr. Gregory Georgiou, Ph.D., LCMHC, Documenting Regression in Treatment Progress Caused by Employer Contact and Communications, Reiterating No-Contact Directive, and Noting Plaintiff's Inability to Perform Daily Life Activities in Multiple Domains

Plaintiff possesses additional documentary evidence—including payroll records, multiple pay stubs, internal HR and benefits correspondence, DocuSign voided notice, and benefits portal screenshots ("not enrolled" status)—which will be produced in discovery or as required by the Court.

## CERTIFICATE OF SERVICE

I hereby certify that on this _____ day of _____, 2026, a true and correct copy of this Complaint and all attached exhibits was served by certified mail, return receipt requested, upon the following:

**Bell Integration, Inc.**
c/o Platinum Filings LLC (Registered Agent)
555 E. Loockerman Street, Suite 320

## ADDENDUM TO EXHIBIT LIST

Ploughman v. Bell Integration, Inc. and TriNet HR III, Inc.

The following corrected and supplemental exhibit descriptions are submitted in addition to the Exhibit List attached to the Complaint:

### Exhibit 8 (Corrected Description):

February 2 and February 5, 2026 Emails from Dominique Phillips, Regional People Partner, Bell Integration: (a) February 2, 2026 email promising Plaintiff 10 front-loaded paid sick days while on leave—sent one day after benefits were already silently terminated February 1, 2026 without notice—while simultaneously characterizing Hartford short-term disability as a "supplemental financial benefit" and demanding direct engagement from Plaintiff despite her provider's active no-contact directive; (b) February 5, 2026 email expressly acknowledging provider's no-contact recommendation while reserving the right to continue direct communications with Plaintiff in violation of that directive.

### Exhibit 15:

February 2, 2026 Email from Dominique Phillips Containing Written Promise of 10 Front-Loaded Paid Sick Days During Protected Medical Leave—Issued One Day After Benefits Were Terminated Without Notice on February 1, 2026—Constituting a Written Wage Commitment Subsequently Unfulfilled.

**TriNet HR III, Inc.**
9000 Town Center Parkway
Bradenton, FL 34202

*[signature]*

Laurita Ploughman, Pro Se

## DECLARATION UNDER PENALTY OF PERJURY

I, Laurita Ploughman, declare under penalty of perjury that I am the Plaintiff in this action, I have read the foregoing Complaint and attachments, and the information contained herein is true and correct to the best of my knowledge, information, and belief. Executed at Indian Trail, North Carolina, on this 23rd day of February, 2026.

*[signature]*

Laurita Ploughman, Pro Se